IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **THE EQUAL RIGHTS CENTER**<br>a not-for-profit organization,<br>11 Dupont Circle, NW, Suite 400<br>Washington, DC 20036 | ) ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| vs. | ) ) | DKC 07-2358 |
| **LION GABLES RESIDENTIAL TRUST**<br>a Maryland Real Estate Investment Trust,<br>3399 Peachtree Road, NE<br>Suite 600<br>Atlanta, GA 30326 | ) ) ) ) ) ) | Civil Action No. ~~AW-05-2626~~<br>Judge Deborah K. Chasanow |
| and | ) ) |  |
| **LION GABLES REALTY LIMITED<br>PARTNERSHIP**<br>a Delaware limited partnership,<br>3399 Peachtree Road, NE<br>Suite 600<br>Atlanta, GA 30326 | ) ) ) ) ) ) ) ) |  |
| Defendants. | ) |  |

## CONSENT DECREE

### INTRODUCTION

1.    The Equal Rights Center (the "ERC"), Lion Gables Residential Trust and
      Lion Gables Realty Limited Partnership (Lion Gables Residential Trust
      and Lion Gables Realty Limited Partnership are collectively referred to as
      " Gables") (the ERC and Lion Gables are collectively referred to as the
      "Parties"), have agreed to enter into this Consent Decree ("Consent

Decree") in order to fully and finally resolve the claims raised by the ERC in its Complaint in this matter (the "Complaint"), including, but not limited to, the ERC's allegations that Gables failed to design and construct certain apartment buildings in accordance with the Fair Housing Act (the "FHA"), 42 U.S.C. § 3604(f)(1), (2) & (3)(C), and failed to design and construct places of public accommodation associated with those apartment buildings in accordance with the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12183(a)(1).

2.    Gables has denied the allegations of the Complaint, and ERC recognizes that Gables has represented that it acted in good faith and had no intention to avoid the requirements of the FHA and ADA. Nothing in this Consent Decree constitutes or may be construed as an admission of liability as to the allegations of the ERC, all of which are expressly denied by Gables.

3.    The Parties' mutual, long-term objective in entering into this Consent Decree includes the goals of increasing the total number of residential properties in the United States that are accessible to persons with disabilities, and of enhancing housing industry compliance with accessibility laws.

4.    The Parties agree that this Court has jurisdiction over the subject matter of this action. The Parties further agree that the controversy should be resolved without further proceedings. Therefore, the Parties have consented to the entry of this Consent Decree as indicated by the authorized signatures appearing below. The provisions of this Consent Decree will be binding on the ERC and Gables, their respective subsidiaries and their successors and assigns, for a period defined in Paragraph I(1) below.

**It is therefore ORDERED, ADJUDGED AND DECREED that:**

A.    FAIR HOUSING PROGRAM

1.    The Parties mutually envision a long-term collaboration with regard to enhancing the housing industry compliance with accessibility laws.

2.    In pursuit of their mutual objective, the Parties have agreed that Gables will participate in the Multifamily Housing Resource Program (the "Program"), initially created by Trammell Crow Residential Company and ERC pursuant to a Consent Decree entered in Case No. 1:07-cv-01231 in the United States District Court for the District of Columbia, in order to provide educational and training resources to the multifamily housing industry, including companies and associations, as a means of promoting and achieving compliance with housing non-discrimination requirements for persons with disabilities

under federal, state, and local laws. The Program will not be involved with advocacy activities.

3.     In order to obtain access to, and the benefits of, the educational, training and consulting resources available through the Program, Gables agrees to be charged and agrees to pay for membership in the Program, including its educational, training and consulting resources, in the amount of an initial payment of $25,000 and nine subsequent annual payments of $10,000. The initial payment under this paragraph will be made via wire transfer to the ERC within 30 days of the entry of this Consent Decree. Subsequent annual payments will be made by the same means by the end of January of each of the succeeding nine years, beginning in January, 2012. Gables will receive those services described in this Consent Decree, as well as other services to be agreed upon by the Parties, without payment of any additional compensation to the ERC.

4.     The Parties agree that the purposes and activities of the Program shall continue to be those set forth in Paragraph A(2) during the period of Gables' participation, and both Parties shall have the right to enforce this Paragraph A(4) during such period.

5.     The ERC retains the right to terminate Gables' participation in the Program, on reasonable notice. If Gables' participation is terminated by election of the ERC, any monetary obligation of Gables under Paragraph A (3) above, will also terminate. Gables has the right to terminate Gables' participation upon reasonable notice. If Gables terminates its participation in the Program for any reason other than an ongoing or repeated material breach by the ERC of its obligations under Paragraph B of this Consent Decree where, after reasonable notice, such breach(s) are not cured (herein defined for this paragraph as "ERC Breach"), it must nonetheless continue to make the payments required under Section A (3). However, Gables shall not be obligated to continue to make such payments in the event of an ERC Breach. Any dispute regarding the right to terminate participation shall be subject to the arbitration provisions of Paragraph 6 below.

6.     The Parties agree that, to the extent ERC is not limited by other provisions of this Consent Decree from bringing suit (e.g. with respect to a matter for which a release has been given including under Section D) the ERC will nonetheless not initiate any lawsuit or administrative action against Lion Gables Residential Trust, Lion Gables Realty Limited Partnership or their affiliates, subsidiaries, successors and assigns or assist any other Party to bring such lawsuit or administrative action, even following a termination of Gables' membership in the Program, alleging violations of the design and

construction provisions of the FHA or ADA with respect to any multifamily properties in which Lion Gables Residential Trust, Lion Gables Realty Limited Partnership or their affiliates, subsidiaries, successors and assigns are or were involved in the design or construction process, for which a building permit was issued prior to entry of this Consent Decree or during Gables' membership in the Program, but that the Parties will instead submit any such matter to the mutually binding arbitration in accordance with the following procedures:

a.   No arbitration shall be initiated by either Party without that Party first having made reasonable efforts to resolve the matter through direct negotiations.

b.   Any dispute, claim, or controversy arising out of or relating to this paragraph, including the determination of the scope or applicability of this paragraph, shall be determined by arbitration in Washington, D.C. before a single arbitrator. The arbitration will be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. The decision of the arbitrator will be enforceable in any court having jurisdiction.

c.   Subject to Paragraph A (6) (d) below, each Party to the arbitration will bear its own costs for preparing and participating in the arbitration, including the costs of counsel, experts, and presentation materials. The Parties to the arbitration will share equally the cost of the arbitrator's fees.

d.   At the conclusion of an arbitration proceeding, the prevailing Party will receive an arbitration award including, but not limited to, its costs of counsel, experts, and presentation materials as allowed by the fee shifting provisions of the FHA, as interpreted by the various federal courts.

e.   Notwithstanding this paragraph, this Consent Decree may be enforced in any court having jurisdiction should either Party refuse to honor its obligations hereunder.

f.   The ERC will seek to negotiate similar dispute resolution agreements with other individual company members of the Program.

Nothing in this Paragraph A (6) shall prevent compliance by the ERC with or otherwise be construed as requiring the ERC to resist compliance with a valid court order from a court of competent jurisdiction.

4

7.   If a third-party lawsuit or administrative action is brought against Lion Gables Residential Trust, Lion Gables Realty Limited Partnership or their affiliates, subsidiaries, successors and assigns, or another housing industry company which is a member and participant in the activities of the Program, the ERC will provide testimony, if requested, as to the activities of the Program and any affirmative actions to enhance accessibility being taken specifically by Lion Gables Residential Trust, Lion Gables Realty Limited Partnership or their affiliates, subsidiaries, successors and assigns or the member by its participation in the Program. The content of such testimony shall be within the discretion of ERC.

8.   The Parties agree to enter into a confidentiality agreement governing the use of information learned or exchanged by the Parties as a result of the implementation of the Program.

**B.   EDUCATION AND TRAINING AND RELATED MATTERS**

1.   Within 180 days of the entry of this Consent Decree, Gables will ensure that certain of its employees who are directly involved in the design and/or construction of covered multifamily dwellings, the identity of such employees to be agreed upon by the Parties, will attend fair housing training provided by the ERC through the Program with specific emphasis on compliance with the accessibility requirements of the FHA and ADA, and will secure a signed statement, in the form attached hereto as **Appendix 1**, from each such employee acknowledging that he/she has received this training. The costs of providing all such training (including travel expenses for the ERC personnel and trainers and program materials including training manuals) will be the sole responsibility of the ERC under the auspices of the Program and at no additional charge to Gables. It is agreed that within the 180 day period provided above, ERC shall provide such training at five (5) different locations around the country selected by Gables except that one of the five locations shall be the District of Columbia. Thereafter, ERC shall provide annual training at up to four (4) different locations around the country selected by Gables each year. Additional training will be provided by the ERC as the Parties determine is desirable; however, the ERC shall not be obligated to conduct such training sessions more frequently than quarterly. Gables shall have a reasonable opportunity to review, discuss and/or supplement the program materials prior to any scheduled training.

2.   Within 180 days of the entry of this Consent Decree, the ERC will review and comment on Gables' practices related to public notice of its nondiscrimination policy and nondiscrimination in advertising and

will assist Gables in implementing reasonable changes if the Parties agree that any changes are necessary or desirable. This review and assistance will be provided by the ERC under the auspices of the Program at no additional charge to Gables.

3.   The ERC shall also provide, at no additional charge to Gables, those review and advisory services which are set forth in other provisions of this Consent Decree.

4.   The ERC shall also consult with Gables, at no additional charge to Gables, from time to time as reasonably requested by Gables, on future matters relating to accessibility design and construction standards and their applicability to specific fact situations which might arise; provided however, that the Parties agree that (i) the ERC shall not be asked to render legal advice; (ii) any comments or such advice will not be binding on Gables; and (iii) the communications during such consultations shall not be used by either Party to draw an adverse inference against Gables or ERC in any subsequent dispute including those related to the Consent Decree.

5.   Gables shall cooperate with the ERC and use reasonable efforts to publicize the availability of its accessible units.

C.   CORRECTIVE ACTIONS FOR CONSENT DECREE PROPERTIES

1.   Properties Subject to Consent Decree: The term "Gables Related Entity" shall mean Gables and any entity in which Gables, directly or indirectly, has an ownership interest. The properties subject to the Consent Decree are the multifamily housing properties in which Gables has an ownership interest and which Gables or a Gables-Related Entity was involved in the design or construction process as an owner, developer or contractor and such property was completed for first occupancy after March 13, 1991, as set forth on Appendix 2 ("Consent Decree Properties").

2.   Representations: Gables represents it has included all of the multifamily housing properties in which it has an ownership interest and as to which Gables or a Gables-Related Entity was involved in the design or construction process as an owner, developer or contractor where such property was completed for first occupancy after March 13, 1991 on **Appendix 2**.

3.   Properties Subject to Remediation: Gables' surveying and remediation obligations under this Consent Decree are limited to housing property as to which both Gables or a Gables-

6

Related Entity was involved in the design or construction process as an owner, developer or contractor and such property was completed for first occupancy after March 13, 1991. If a Gables community contains a commercial office (other than the leasing or rental office for the property), retail or other non-housing commercial space, Gables has no remediation or other obligations under this Consent Decree for the interior of such space. Gables agrees that, subject to the provisions of Paragraph C (6) (a), (b), and (c), and Paragraph C (8), it will survey no less than 3,500 covered dwelling units[1] in the Consent Decree Properties as specified above in this Paragraph C (3), and to the extent necessary, remediate those covered units ("Required Remediated Units"). Such initial surveys ("Initial Survey") of units may be done by sampling in cases where floor plans or other features are identical for all practical purposes. However, notwithstanding the foregoing, the decision, as to whether to sample and how such samples shall be chosen, shall be made by the Consultants chosen pursuant to Paragraph C (4) (a). If any units in a Consent Decree Property are surveyed and/or remediated and are to count toward the Minimum Remediated Units as that term is defined in Paragraph C (6)(d), below, the common areas and facilities associated with that apartment property (i.e., with the apartment rental component of a building or community) will also be surveyed and, to the extent necessary remediated. In every Consent Decree Property in which Gables claims one or more of the units subject to the minimum remediated units requirements of Paragraph C(6)(d), are found, Gables shall survey and if necessary, remediate, all public and common use areas, subject to the limitations of Paragraph C (3).

4.   Initial Surveys of Consent Decree Properties:

a.   The Consent Decree Properties, as determined by Gables, will be surveyed either by a jointly agreed-upon consultant ("Consultant") or by two consultants (the "Consultants"), one being appointed by each of the Parties. A list of already approved Consultant(s) is set forth in **Appendix 6**. In the event the Parties agree to use a single Consultant Gables may also retain an additional consultant ("Gables' Expert"), who will be permitted to participate and interact with the Consultant in the survey, remediation and final inspection process as to any or all of the Consent Decree Properties

---

[1] The term "covered dwelling units" (also sometimes referred to herein as "covered units") means those units that are subject to the FHA pursuant to the definition of "covered multifamily dwellings" as set forth at 42 U.S.C § 3604(f)(7).

as determined by Gables. The single Consultant and Gables' Expert or the Consultants, as applicable, will attempt to work cooperatively with each other in providing joint reports. If they are unable to agree, they will notify the Parties of the disagreement and the Parties will resolve the issue in accordance with the dispute resolution terms contained in Paragraphs A (6) and I (3) of this Decree.

b.  Within 90 days of the entry of this Consent Decree by the Court, Gables will, in consultation with the Consultant(s), provide the ERC with a schedule for surveys to be conducted at the selected Consent Decree Properties that contain the covered units to be surveyed and, if selected, remediated.

c.  The Consultant(s), with the cooperation of Gables, will conduct an Initial Survey of each selected Consent Decree Property to determine the existence and scope of any deficiencies in compliance with the applicable accessibility requirements of the "Safe Harbors"[2]. The Consultant shall not consider a particular element to be deficient if it meets the requirements of any one Safe Harbor (it being agreed that Gables has the discretion to choose which Safe Harbors apply and that multiple Safe Harbors may be applied to each Consent Decree Property).

d.  The Consultant(s) will provide the Parties with a written report of each Initial Survey within 14 days of the completion of that survey.

e.  The Consultant(s) and Gables will use their best efforts to complete all such Initial Surveys within sixteen months from the date of entry of this Consent Decree. It is agreed that if the Consultant is unable to provide the necessary inspection, reporting and other services under Section C, in a timely fashion, the Parties will confer and determine whether to utilize an additional or a different Consultant for the remainder of the work under the Consent Decree. The provisions of Paragraph C (4) (a) shall apply to the selection of any additional or substitute Consultant(s).

---

[2] "Safe Harbor" means any of the following: a) ANSI A117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A117.1 (1998); the Code Requirements for Housing Accessibility (CRHA, 2002); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor or FHA compliance standard (whether stated as a code or with respect to one of more features or design elements) recognized by HUD. To the extent Gables relies upon ANSI standards as a Safe Harbor, those standards will be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

f.  Gables and/or the ERC may, at their own individual expense, designate a representative(s) to observe such Initial Surveys as they deem appropriate.

g.  Subject to Paragraph C (4) (f), all expenses related to the Initial Surveys will be borne by Gables.

5.  Remediation:  Gables agrees to cause its affiliates and subsidiaries to provide certain accessibility remediation at the selected Consent Decree Properties (including the public and common use areas and individual units).  The accessibility remediation is subject to the following requirements and limitations:

a.  Within 30 days of receipt of the Initial Survey report for each selected Consent Decree Property, the Parties will make a good faith effort to agree on the alterations, if any, to be made in that Property ("Property Alteration Agreement") in accordance with the provisions of Paragraph C (5) (b) below.  (A "form" Property Alteration Agreement is provided at **Appendix 3**.)

b.  Each Property Alteration Agreement will detail the Parties' understandings regarding the alterations to the covered dwelling units and the common use and public use areas of the Consent Decree Properties so as to bring the Property into compliance with the selected "Safe Harbors"; however such Safe Harbors are subject, at Gables' election, to the Remediation Tolerances set forth in **Appendix 4**, and such other exceptions as may be agreed to by the Parties.  Further, it is agreed that different Safe Harbors may apply at a single property.

c.  Gables will cause each selected Consent Decree Property to be altered, to fully comply with the applicable Property Alteration Agreement.

d.  The Parties will endeavor in good faith to resolve informally any issues regarding the terms of Property Alteration Agreements and Gables' compliance therewith prior to bringing the issues to the Court for resolution.

6.  Multiple Credit Rights:

a.  Gables will receive double credit toward its Required Remediated Units for surveying and to the extent necessary, remediating any "affordable" units.  For purposes of this section, "affordable" units are those that are "affordable" where the units are located, for

9

families earning at or below 60% of the applicable Area Median Income under HUD guidelines.

b.  Gables will receive double credit toward its Required Remediated Units for each appropriately disbursed "super accessible" unit which is not otherwise required by law and which is created (including through remediation or new construction) by Gables or a Gables-Related Entity at anytime during the term of this Consent Decree. For purposes of this Paragraph C (6) (c), "super accessible" units are those built to comply with the 2010 ADA Standards for Accessible Design, Section 224.

c.  Gables will receive quadruple credit toward its Required Remediated Units for remediating and/or creating units that are both "affordable" and "super accessible," as those terms are defined herein.

d.  <u>Minimum Remediated Units</u>: To the extent that Gables remediates units eligible for multiple credits under subparagraphs (a), (b) and (c) of this subparagraph or sells properties under subparagraph C (7) of this Consent Decree, Gables will nevertheless survey and, if necessary, remediate no fewer than 2,625 apartment units (the "Minimum Remediated Units") during the term of this Consent Decree. Further, Gables agrees that the Minimum Remediated Units shall include at least 200 units in properties which were completed for first occupancy prior to September 6, 2005. For clarification, it is noted that if a covered unit at a Consent Decree Property is included in a survey but no remediation or alteration of that unit is required under this Consent Decree (and applicable Property Alteration Agreement), then such unit shall nonetheless count toward the required Minimum Remediated Units provided that the public and common use areas at such Property has also been surveyed and remediated, if necessary, subject to the limitations in Paragraph C (3).

7.  <u>Sale of Selected Consent Decree Properties</u>:

Without regard to whether any Consent Decree Property has been Surveyed, Gables may sell or transfer any Consent Decree Property at any time so long as following any voluntary sale or transfer either (i) Gables is not prevented from fulfilling (or causing to be fulfilled) its obligations under this Consent Decree, including those outlined in Paragraph C(3) above, or (ii) the documentation in such sale or transfer provides that the purchaser or transferee (or, in the case of transfer in a merger or other business consolidation, the surviving entity) assumes Gables' obligations in respect to fulfilling (or causing to be fulfilled) its obligations under this Consent Decree, including those outlined in Paragraph C(3) above. Gables may count

the inspected, and if necessary remediated units in any sold consent Decree Property as remediated units for the purpose of complying with its obligations to inspect and, if necessary, remediate the required number of Minimum Remediated Units.

8.    Time of Completion of Remediation Activities:  The Parties agree to the completion of the remediation work contemplated in this Paragraph C as soon as practicable, but in no event later than the following:

a.    Alterations relating to public use and common use areas will be completed within one year of the execution of an applicable Property Alteration Agreement, provided that this period may be extended for good cause in the event that Gables is unable to complete such Remediation Activities after reasonable good faith efforts.

b.    Alterations relating to the interiors of covered dwelling units will be completed at the time of turnover of occupancy for those units but in no event later than 60 months after the execution of the applicable Property Alteration Agreement.  Notwithstanding the foregoing, should any tenant request alterations in his/her unit to bring the same into compliance with the design standards required by Paragraph C (4) Gables will, in addition to completing the requested alterations as required in Paragraph C (9), within 120 days (or such greater period of time as may be reasonably necessary under the circumstances), complete the alterations called for in the applicable Property Alteration Agreement relating to all common use and public use facilities reasonably affecting that tenant's day-to-day activities.

9.    Actions as to Individual Tenants:

a.    Within 60 days of the date of the entry of this Consent Decree, and during the term of this Consent Decree, Gables will submit its written policies regarding reasonable accommodations and reasonable modifications to the ERC for review, comment and agreement.

b.    Within 90 days of entry of this Consent Decree ERC and Gables will reach an agreement as to Gables' written policy regarding reasonable accommodations and reasonable modifications.  During the term of this Consent Decree, a copy of such policy will thereafter promptly be delivered to all existing tenants of Gables owned properties and will be given to all prospective tenants with Gables form of lease agreement.

11

c.    Beginning 60 days from the entry of this Consent Decree, and during the term of this Consent Decree a copy of such policy, Gables will inform each existing and prospective tenant of a Consent Decree Property, that is not scheduled for an Initial Survey that such tenant who has a disability or who can demonstrate recurring visitation by persons with a disability may, upon request, have his or her unit retrofitted to conform with the design standards required by Paragraph C (5) and **Appendix 4.** The alterations necessary to conform with the design standards required by Paragraph C (5) and **Appendix 4** will be performed at no cost to the tenant; however any requested alterations not required by the design standards set forth in Paragraph C (5) and **Appendix 4** shall be subject to Gables' reasonable modifications policy. In addition to the extent that Gables chooses to not remediate units at a Consent Decree Property that has been subject to an Initial Survey and a remediation requirement, the terms of this paragraph shall apply and the required notice shall be given 60 days from the due date when Gables makes its decision to forgo the remediations.

d.    For any unit that is modified pursuant to this Paragraph C (9) the inspection and certification requirements of Paragraph C (12) will apply if such unit is to count towards the Required Remediated Units, provided that Gables causes the common and public use areas of the Property to be surveyed and, if necessary, remediated pursuant to the requirements and limitations of Paragraphs C (3), C (4) and C (5).

e.    If Gables receives a written or oral request to perform any alterations from a tenant under this Paragraph C (9), Gables will commence, and use its reasonable efforts to complete, the retrofit within 90 days from the date of the tenant's request. Gables will create and maintain records of all requests, responses, and alterations completed under this paragraph C (9).

f.    In lieu of performing the retrofits required under this Paragraph C (9), Gables may comply with this paragraph by offering relocation of the requesting tenant to another unit within the same property ("Relocation Unit"), if:

    (i)    the Relocation Unit is comparable with the requesting tenant's unit in layout, features, location, and size;

    (ii)    the Relocation Unit is in compliance with the design standards set forth in paragraph C (4) or otherwise acceptable to the tenant;

          (iii)     such relocation is provided at no cost to the requesting tenant.

10.    <u>Dislocation of Tenants</u>:  Gables will attempt to minimize any dislocation to current and future tenants caused by the remediation work.  Gables will reimburse current or future tenants for their reasonable and necessary costs of temporary housing and for their reasonable and necessary out of pocket expenses directly caused by the remediation work.

11.    <u>No Pass-Through of Costs to Tenants</u>:  Gables agrees that no additional rent, deposit, or other fee may be charged solely because of contemplated or completed remediation work performed pursuant to the requirements of Paragraph C (4) or C (5) or Paragraph C (9).  At any of the Consent Decree Properties, consistent with federal, state and local laws, Gables may charge tenants for all of the costs of other "reasonable modifications" including the return at the end of the tenant's lease of a unit or area to its pre-existing condition, at the tenant's expense.

12.    <u>Inspection and Certification of Completed Remediations at Properties</u>

    a.    The Consultant(s) will be retained by Gables to conduct on-site inspections of the remediation work that has been performed at each selected Consent Decree Property to determine if such work has been completed in accord with the Property Alteration Agreement.  Upon completing the remediation work at a selected Consent Decree Property, Gables will provide notice to the ERC and the Consultant(s) (a "Completion Notice").

    b.    Within 21 days after a Completion Notice is sent, and upon not less than seven days notice to Gables, if reasonably possible, the Consultant(s) will conduct the on-site inspection.  Inspections will be carried out so as to minimize, to the extent possible, disruption to tenants.

    c.    Within 14 days following each on-site inspection, the Consultant(s) will send to the Parties written results of each inspection, if reasonably possible, including deviations in compliance with the Property Alteration Agreement, if any.

    d.    Gables will make a good faith effort to correct any deviations from the Property Alteration Agreement in all units requiring the same Alteration within 90 days following receipt of the report from the Consultant.  All costs associated with these inspections and any

corrections to remedy deviations will be paid by Gables.  Upon final completion of the Alterations, and certification by the Consultant, the ERC will provide Gables with a release in the form attached hereto as **Appendix 5**.

e.    If the Consultant cannot complete the inspection in the time provided, reasonable additional time will be permitted subject to the agreement of the Parties in Paragraph C (4) (e) concerning the timely work of the Consultant.

13.    Future Compliance

Gables, its subsidiaries and its successors and assigns, shall comply with the relevant provisions of the FHA and ADA in connection with the design and construction of their future covered multi-family housing.

**D.    RELEASE**

The ERC releases all claims relating to accessibility under the design and construction provisions of the FHA, the ADA, and any similar state or local accessibility law related to each and every Consent Decree Property that is chosen under this Consent Decree for survey and, if selected, remediation, that were brought or could have been brought as of the date of the release, except for the obligations under this Consent Decree.  As to all Consent Decree Properties that are not chosen under this Consent Decree for survey and, if required, remediation, the ERC expressly covenants and agrees to forever refrain from instituting, maintaining, prosecuting, continuing to maintain or prosecute any suit, action or proceeding or assisting others with any suit, action or proceeding against Gables, Gables-Related Entities, their subsidiaries and affiliates, and other entities or individuals which have or, in the past, had an ownership interest in such Consent Decree Property in question, or which had a role in the design, construction or management of that Consent Decree Property as well as the officers, directors, managers, members,  trustees, employees and agents of such entities or individuals, and the respective successors and assigns of all of those parties referenced above (the "Gables-Released Parties"), alleging claims under the FHA and ADA, and any similar state or local accessibility law related to the design or construction of that Consent Decree Property, except related to changes made by Gables to the Consent Decree Property in question after the entry of this Consent Decree.  The release and covenant not to sue provisions of this Paragraph D are issued in perpetuity and shall survive the term of the Consent Decree.

**E.    NEW RESIDENTIAL MULTIFAMILY RESIDENTIAL PROJECTS**

1.    For the term of this Consent Decree, Gables will have all future multifamily residential projects in which Gables or a Gables-Related Entity is involved as owner and/or in the design and construction, except for those projects in which the Gables-Related Entity is only

14

acting as the General Contractor or property manager for the project, reviewed during design and construction by a third-party fair housing and ADA consultant with knowledge and expertise in the requirements of the FHA and the ADA.

2.      During the term of this Consent Decree, the ERC will review and comment on Gables' program of third-party reviews at no cost to Gables.

F.      REPORTING

In addition to any other reporting and disclosure requirements set forth throughout this Consent Decree, within 180 days after the entry of this Consent Decree, and on the annual anniversary date of the entry of this Consent Decree until the expiration of this decree, Gables will submit to the ERC a report containing a description of Gables actions in the preceding period to comply with the training, remediation, and other requirements of this Consent Decree.

G.      PAYMENT TO THE ERC

1.      In addition to the payments described in Paragraph A(3) of this Consent Decree, Gables will make an agreed-upon monetary payments to the ERC as set forth in the Side Letter Agreement, dated April 19, 2011, ("Side Letter Agreement") between the Parties. The Parties agree that the payment referenced herein constitutes payment for damages, attorneys' fees, costs and other expenses incurred by the ERC in connection with the Complaint and this Consent Decree.

2.      During the term of this Agreement, Gables will reimburse the ERC, at the standard billing rates then in effect, for the reasonable attorneys' fees and costs actually incurred by the ERC and its counsel in negotiating, preparing and monitoring the performance of the Property Alteration Agreements, which amounts shall not exceed $4,500 per calendar quarter in the aggregate for any and all inspections, negotiations, Property Alteration Agreements, etc. Such costs shall not include any charges for administrative time by employees or contractors of the ERC; provided however that the term "contractors" as used herein expressly does not include attorneys and legal assistants. All requests for reimbursement by the ERC shall be accompanied by itemized timesheets and supporting documentation for expenses. At the ERC's option, its counsel may submit its invoices directly to Gables for payment, provided such invoices are accompanied by itemized timesheets and supporting documentation for expenses.

**H.**   DISPOSITION OF DISCOVERY MATERIALS

   1.   Within sixty (60) days after the entry of this Consent Decree, each Party will:

   a.   Either return or destroy all documents that have been produced by the other Party in the course of this litigation; and

   b.   Destroy all documents obtained from third Parties in the course of this litigation that have been generated by the other Party

   2.   If a Party chooses to destroy documents rather than return them, it will provide the other Party with a certificate of destruction executed by counsel of record.

   3.   Notwithstanding the provisions of this Section H, each Party will be entitled to maintain copies of all correspondence, memoranda, pleadings, discovery requests and responses, deposition transcripts, hearing transcripts and hearing exhibits.

**I.**   MISCELLANEOUS

   1.   Term of Decree

   This Consent Decree will remain in effect for four years and, as to completion of unfinished remediation work, longer until such time as final certification of all remediation work contemplated hereunder and under the Side Letter Agreement is complete. Gables participation in, and obligation for payment of the educational, training and consulting resources of, the Program shall continue for a total of ten years, except as provided in Paragraph A (5). In addition, the following provisions of this Consent Decree and the Side Letter Agreement shall survive the term of the Consent Decree: Consent Decree Paragraph D and Side Letter Agreement Sections 1 and 2.

   2.   Retained Jurisdiction to Enforce Decree

   The Court will retain jurisdiction for the duration of this Consent Decree to enforce the terms of this Decree and the terms of the Side Letter Agreement.

   3.   Dispute Resolution

   The ERC and Gables will each act reasonably and endeavor in good faith to resolve informally any differences regarding interpretation of and compliance with this Consent Decree and the Side Letter Agreement prior to bringing such matters to the Court for resolution. However, in the event of a failure by either Party to perform any act required by this Consent

16

Decree or the Side Letter Agreement in a timely manner or otherwise to act in accordance with any provision hereof, which is not subject to the dispute resolution process in Paragraph A (6) of the Consent Decree, the other Party may move this Court to impose any remedy authorized by law or equity, including, but not limited to, an order requiring performance of such act or deeming such act to have been performed, and an award of any damages, costs, and reasonable attorneys' fees which may have been occasioned by the violation or failure to perform.

4.    Time for Performance

The time frames imposed by this Consent Decree and the Side Letter Agreement for the performance of certain acts may be extended by the mutual written agreement of the ERC and Gables without requirement of Court approval.

5.    Notice to the Parties

Notice to the Parties may be given by facsimile (if also mailed by first-class mail), in which case notice will be deemed to have been received on the day of transmission, as follows:

If to the ERC:

Executive Director
Equal Rights Center
11 Dupont Circle, N.W., Suite 450
Washington, D.C. 20036
Telephone: 202-234-3062
Facsimile: 202-234-3106

*And*

Director, Fair Housing Project
Washington Lawyers' Committee for
Civil Rights & Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Telephone: 202-319-1000
Facsimile: 202-319-1010

If to Gables:

Susan M. Ansel
Chief Operating Officer
Gables Residential
2650 Cedar Springs Road, Suite 800
Dallas, TX 75201
Telephone: 214-252-2611
Facsimile: 214-252-2601

17

sansel@gables.com

*And*

Christopher B. Hanback
Lynn Calkins
Holland & Knight LLP
2099 Pennsylvania Ave., N.W.
Suite 100
Washington, DC 20006
Telephone: 202-955-3000
Facsimile: 202-955-5564
Christopher.hanback@hklaw.com
Lynn.calkins@hklaw.com

6.   Reservation of Other Claims

This Consent Decree, and any release hereunder will have no force or effect with respect to the ERC's claims as against any person or entity other than Gables and the Gables-Released Parties, all such claims have been specifically reserved by the ERC except that Gables and Gables-Released Parties will initially have the sole right to pursue claims against their design professionals and contractors/subcontractors who performed design or construction work at any of the Consent Decree Properties. ERC agrees not to pursue any claims arising out of the Consent Decree Properties and released properties against any of the design professionals and contractors/subcontractors unless Gables expressly waives the right to bring any such claims.

7.   Representations

RESERVED

8.   Titles and References

The titles and paragraph references used in this Consent Decree are non-substantive descriptions included solely for the Parties' ease of reference and will not be construed to alter the substantive provisions of this Consent Decree.

9.   Counterparts

This Consent Decree may be executed in counterparts, all of which when taken together shall constitute a single instrument.

10.    Integration Clause

This Consent Decree, including the appendices attached hereto, and the
Side Letter Agreement constitute the entire agreement and understanding
between the Parties and supersede all prior communications or
negotiations between the Parties and their representatives regarding the
matters contained in this Consent Decree.  Evidence of prior negotiations
(including but not limited to drafts of this Consent Decree and its related
documents) may not be introduced in any proceeding to enforce the terms
of this Consent Decree.  Except as explicitly set forth in this Consent
Decree, there are no representations, warranties, promises, or
inducements, whether oral, written, expressed, or implied, that in any way
affect or condition the validity of this Consent Decree or alter its terms.
This Consent Decree may be amended only by a contemporaneous or
subsequent written instrument executed by all of the Parties hereto or by
approval of the Court.  The wording of this Consent Decree was reviewed
by legal counsel for each Party, and both Parties had sufficient
opportunities to propose and negotiate changes in wording prior to its
execution.  Neither the ERC nor Gables will be entitled to have any
wording of this Consent Decree construed against the other based on any
contention as to which of the Parties drafted the language in question.

*Agreed this day,* _____May 11_____ ,2011

THE EQUAL RIGHTS CENTER

By: _____

Robert M. Bruskin
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW. Suite 400
Washington DC 20036
Telephone:  202-319-1000
Facsimile:  202-319-1010
Bob_bruskin@washlaw.org

*Attorney for the Equal Rights Center*


LION GABLES RESIDENTIAL
TRUST and LION GABLES REALTY
LIMITED PARTNERSHIP

By: _____

Christopher B. Hanback
Lynn Calkins
Holland & Knight LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, DC 20006
Telephone: 202-955-3000
Facsimile: 202-955-5564
Christopher.hanback@hklaw.com
Lynn.calkins@hklaw.com

*Attorneys for Lion Gables Residential Trust
and Lion Gables Realty Limited Partnership*


**So ordered.**

_____
Judge

Date: _____May 16_____ . 2011


20

## LIST OF APPENDICES

**No.**      **Description**

1      Employee Training Acknowledgment

2      Consent Decree Properties

3      Form of Property Alteration Agreement

4      Remediation Tolerances

5      Form of Release

6      List of Consultants

## APPENDIX 1

## FORM OF EMPLOYEE TRAINING CERTIFICATION

     I, _____, an employee of Gables_____, or one of its related companies, hereby acknowledges that I have received fair housing training with specific emphasis on compliance with the accessibility requirements of the FHA and ADA.


_____

[Employee name]


_____

Date

## APPENDIX 2
### CONSENT DECREE PROPERTIES

| Property Name | Location | Number of Units | Number of Covered Units |
|---|---|---|---|
| Metropolitan I | Atlanta, GA | 435 | 230 |
| Metropolitan II | Atlanta, GA | 274 | 267 |
| Metropolitan III | Atlanta, GA | 448 | 448 |
| Montclair | Decatur, GA | 183 | 18 |
| Rock Springs II | Atlanta, GA | 233 | 134 |
| Rock Springs III | Atlanta, GA | 193 | 155 |
| Vinings | Smyrna, GA | 315 | 96 |
| 820 West | Atlanta, GA | 248 | 248 |
| Century Center | Atlanta, GA | 355 | 355 |
| Sheridan | Atlanta, GA | 329 | 329 |
| Midtown | Atlanta, GA | 345 | 345 |
| Montecito | Palm Beach Gardens, FL | 450 | 84 |
| Wellington | Wellington, FL | 222 | 58 |
| Wilton Park | Wilton Manors, FL | 145 | 81 |
| Palma Vista | Boca Raton, FL | 189 | 29 |
| Town Lake | Austin, TX | 256 | 84 |
| Westlake | Austin, TX | 175 | 48 |
| 5th Street Commons | Austin, TX | 150 | 150 |
| Pressler | Austin, TX | 168 | 168 |
| Park Plaza | Austin, TX | 290 | 290 |

| Property Name | Location | Number of Units | Number of Covered Units |
|---|---|---|---|
| Central Park | Austin, TX | 273 | 91 |
| Grandview | Austin, TX | 458 | 106 |
| Villa Rosa I | Dallas, TX | 311 | 311 |
| Park Seventeen | Dallas, TX | 292 | 292 |
| Villa Rosa II | Dallas, TX | 239 | 239 |
| Republic Tower | Dallas, TX | 229 | 229 |
| 6464 | Houston, TX | 163 | 163 |
| West Avenue (Houston) | Houston, TX | 397 | 397 |
| Upper Kirby | Houston, TX | 144 | 144 |
| Takoma Park | Washington DC | 145 | 145 |
| 12 Twenty one | Arlington, VA | 132 | 132 |

## APPENDIX 3

### Form of Property Alteration Agreement

### *PROPERTY ALTERATION AGREEMENT*

### *[This form to be customized by experts to delineate model types and other property-specific information.]*

### *[Complex Name and Address]*

This Property Alteration Agreement (this "Agreement"), dated as of _____, 201__, is entered into by and among Lion Gables Residential Trust and Lion Gables Realty Limited Partnership("Gables") and the Equal Rights Center, a not-for-profit corporation (the "ERC"), with respect to [Property Name and Location] (the "Property"). A site plan is attached hereto as **Exhibit A**.

### RECITALS

WHEREAS, GABLES and the ERC (collectively, the "Parties") have entered into a Consent Decree (the "Consent Decree") which provides, among other things, that the Parties will agree upon alterations (the "Alterations") to be made to certain properties with which GABLES has been involved, and

WHEREAS, a survey has been conducted of the Property, and

WHEREAS, the Parties desire to enter into an agreement concerning Alterations to be made at the Property,

NOW THEREFORE, pursuant to the terms of the Consent Decree, the Parties agree as follows:

I.    **General Provisions**

A.    Release. Upon completion, inspection and certification of the Alterations in accordance with this Agreement, the ERC will provide the Release specified in Paragraph C. 12(d) of the Consent Decree. Provision of the Release will be conclusive evidence of the satisfactory completion, inspection and certification of the Alterations in accordance with this Agreement.

B.    Counterparts. This Agreement may be executed in counterparts, all of which when taken together will constitute a single instrument.

II.    **Alterations to Public Areas:**

1.    Issue:
        1.1.    Action:

2.    Issue:
    2.1.   Action:

## III.   Alterations to Common Areas:

  1.  Issue:
    1.1. Action:

  2.  Issue:
    2.1.

## IV.   Alterations to Units:

  1.  Issue:
    1.1. Action:

  2.  Issue:
    2.1. Action


EQUAL RIGHTS CENTER

By:_____

Name:_____

Title:_____


LION GABLES RESIDENTIAL TRUST and LION GABLES
REALTY LIMITED PARTNERSHIP

By:_____

Name:_____

Title:_____

## APPENDIX 4

### Remediation Tolerances

With respect to the Remediation Properties, remediation will be made to one or more "Safe Harbors," selected by Gables.  In applying the selected Safe Harbor(s) Gables may, but is not required to, apply the following remediation tolerances: [2]:

a.  Thresholds:  all thresholds, in units, having a vertical rise of more than ¼" but no more than ¾" will either be beveled or replaced with a conforming threshold.  Thresholds having a vertical rise in excess of ¾" will be replaced with conforming thresholds.

b.  French Door Thresholds:  vertical rise on French door threshold may, if ramped at a ratio of 1:12, be up to 1".

c.  Patio/Balcony Thresholds:  at all patio and balcony thresholds having an interior vertical rise of more than ¼," but no more than 1" a ramping mechanism at 1:2 from ¼" to ¾", or at 1:12 from ¾" to 1", may be installed so as to make the doorway accessible to persons using wheelchairs.  Thresholds with an interior vertical rise of more than 1" will be replaced with one meeting all other criteria of a Safe Harbor.

d.  Doors:

    (i)    In the event that a door to an accessible bathroom is in compliance with the selected Safe Harbor, a second door to that same bathroom will not be required to be remediated;

    (ii)    The interior door width requirement of 32" nominal (31.5") may be met through the use of offset hinges;

    (iii)    Closets of 26" or lesser depth will not be required to meet 32" nominal width door requirements.

e.  Kitchens (unless otherwise agreed upon):

---

[2] "Safe Harbor" means any of the following:  a) ANSI A117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A117.1 (1998); the Code Requirements for Housing Accessibility (CRHA, 2002); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor or compliance standard (whether stated as a code or with respect to one of more features or design elements) recognized by HUD.  To the extent Gables relies upon ANSI standards as a Safe Harbor, those standards will be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

(i)    Clear floor space on sinks and applicable appliances may be off-center by up to 2";

(ii)    In U-shaped kitchens, no remediation would be required if turning diameter is no less than 59". If diameter is less than 59" removable base cabinets sufficient to allow for "T-turns" would be sufficient;

(iii)    In galley kitchens, no remediation would be required if the distance between the faces of the opposable elements (cabinets and appliances) is 39" or greater;

(iv)    If the clear floor space is impinged by an appliance, the resident will be offered a smaller replacement appliance at no cost.

f.   Switches, Outlets, and Environmental Controls:

(i)    Maximum height of 49" and minimum height of 14", each measured to the centerline of, respectively, the higher or lower receptacle or an outlet or switch or the centerline of the highest operable control of the thermostat; if higher than 49", lower to 47" or lower, and if lower than 14" raise to 16" or above; and

(ii)    Outlets over kitchen counters in inaccessible locations could remain if an equal number of outlets with comparable electrical capacity are provided in accessible locations within the same area. For purposes of this provision, the "same area" means that an accessible outlet is located within 36" or serves the same uninterrupted countertop as the inaccessible outlet, and is not within 32" of any corner. Alternatively and as contemplated by International Building Code 2003, each kitchen corner which is cited for having a non-compliant outlet need not be remediated if the following conditions are satisfied:

(a) The cited outlet is above a length of countertop that is uninterrupted by a sink or appliance;

(b) At least one outlet along the uninterrupted length of the countertop is located with its centerline 25 inches or greater from an inside corner of an L-shaped countertop or flush with opposing edge if the countertop depth exceeds 25 inches (such an outlet has :ANSI Compliant Clear Floor Space"); and

(c) All other outlets along the same uninterrupted length of countertop have ANSI Compliant Clear Floor Space.

If the above three conditions are not satisfied than the following shall apply:

Either an outlet shall be added or moved to be at least 25 inches or more from an inside corner of an L-shaped countertop, and in no case shall a required retrofit result in more than one outlet closer than 25 inches from an inside corner of an L-shaped countertop, or an outlet shall be added at 36" or more from a corner of that run of counter space.

Notwithstanding the foregoing, for each unit where, after any modifications, there is no outlet that is 32" or more from the corner and upon tenant request, a power strip for use with kitchen counters shall be provided to those residents who request them and all future tenants will be so advised in their leases.

g.  Bathrooms (unless otherwise agreed upon):

    (i)   Clear floor space on sinks, toilet and tub may be off-center by up to 2";

    (ii)  Toilets at least 16" from the "grab bar" side wall and 14" from the "non-grab bar" side wall need not be repositioned.  Off-set flanges may be used to reposition toilets requiring remediation;

    (iii) Countertop heights in unit bathrooms need not be altered if no higher than 35" AFF; and

    (iv)  wing-its may be used in lieu of cross-bracing as reinforcement for grab bars.

h.  Mailboxes

    (i)   If the lower rows of mailboxes are less than 49" they will not need to be repositioned so long as any tenant with a disability is provided the option to be assigned (or moved to) a mailbox on a level below 48".

i.  Common Use Areas:

    (i)   At least one route to the primary door and various parts of the clubhouse and leasing office must be "accessible" as defined by a recognized Safe Harbor;

    (ii)  reflective mirrors need not be altered if no more·than 45" AFF, and mirror is tiltable:

    (iv)  signage need not be altered if it meets all other FHA and ADA criteria and is no more than 62" AFF measured to the center of the sign;

    (v)   grab bars for toilets need not be altered if no more than 35"- 37" AFF;

j.  Accessible Routes

(i)  Site or legal constraints will be acknowledged as a basis to provide an accessible route to a secondary entrance;

(ii)  Running Slopes and Cross Slopes:  unless otherwise agreed to by the Parties (a) walkways (excluding at entries and landings) need not be altered as to running slope if their running slope is 5.25% or less, and the walkways are otherwise FHA and ADA compliant.  Walkway slopes above 5.25% will be altered to 5.00%, or will be considered ramps not walkways, and will have handrails on both sides except at curb ramps ; (b) ramps with running slopes of up to 8.75% (but complying with all other requirements for ramps) need not be altered. Ramps with running slopes above 8.75% will be altered to no more than 8.33%;  (c) cross-slopes of walkways and ramps (but not at entries or landings) need not be altered as to cross-slope if the existing cross-slope is no greater than 4.00%, and the walkways and ramps are otherwise FHA and ADA compliant.  Walkways and ramps with cross-slopes in excess of 4.00% will be altered to no more than 2.00%;

(iii)  accessible parking spaces need not be altered if they meet all other FHA and ADA requirements, and width is no less than 12';

(iv)  handrail extensions need not be altered if they are no less than 11".

k.  Protruding Objects:  Sconces or other objects that protrude 5" or less as measured from the baseboards of the walls in hallways (if such baseboards are a uniform distance from the wall) or which are higher than 78" AFF and protrude any distance may remain.

l.  General Provisions:

(i.)  The Parties recognize that some remediation efforts would be impossible or substantially burdensome balanced against the objectives of the FHA and ADA.  In such circumstances, the Parties will, in good faith, seek alternative accessibility modifications to mitigate the violation and maximize accessibility.  The applicability of this provision is limited to those situations in which remedying a particular deficiency in any single unit would result in a substantial magnitude or burden.  This provision does not apply in situations where the cumulative effect of several alleged deficiencies results in a substantial magnitude or burden for fixing a single unit, nor  will it be applied to any alleged deficiency that causes a retrofit with a substantial magnitude or burden only because a retrofit is necessary for a large number of units.

(ii.)  If, after negotiating in good faith to agree on alternative accessibility modifications under this provision, the Parties remain in disagreement, either Party may promptly petition the Court for a determination as to the extent of

the retrofit to be performed, or for a determination that no retrofit need be made.

(iii.) Notwithstanding any other provision of this Consent Decree or this **Appendix 4** (including the preceding paragraphs (i) and (ii) of this paragraph l), Gables shall not be required to move a load bearing wall or a wall that would include relocating plumbing, electrical panels, or an HVAC chase, or to install an elevator as part of a retrofit, or to build a new load bearing wall or install steel girders on account of the retrofit work, or to provide any remediation when no feasible alternative is identified or where Gables can demonstrate that retrofit work will adversely affect the structural integrity of the building.

## APPENDIX 5

### Form of Release for [Property Name]

Reference is made to the Consent Decree between the Equal Rights Center and Lion Gables Residential Trust and Lion Gables Realty Limited  Partnership dated _____, 2011.  Capitalized terms used herein have the meanings associated thereto in such Consent Decree.

[Property Name] was one of the Consent Decree Properties that was selected for survey and, if required, remediation under the terms of the Consent Decree.  There were ___ units at [Property Name] that count towards the total number of Required Remediated Units as set forth in the Consent Decree.  The Equal Rights Center (and its affiliates, successors, or assigns) hereby releases, and covenants and agrees that it will forever refrain from instituting, maintaining, prosecuting, or continuing to maintain or prosecute any suit or action or proceeding or assisting others with any suit or action or proceeding against, Lion Gables Residential Trust and Lion Gables Realty Limited Partnership, its subsidiaries and affiliates, and other entities or individuals which have or, in the past, had an ownership interest in [Property Name], or which had a role in the design, construction or property management of [Property Name], as well as the officers, directors, managers, trustees, employees and agents of such entities or individuals and the respective successors and assigns of all of those herein (collectively, the "_____ PARTIES"), relating to any and all claims under the Fair Housing Act Amendments of 1988 related to the design and construction of multifamily housing, the Americans with Disabilities Act, and any state or local accessibility law relating to [Property Name], except related to changes made after the date hereof (other than such changes made pursuant to the Consent Decree or the Property Alteration Agreement for [Property Name]).

**APPENDIX 6**

**Approved Consultant(s)**

Phillip Zook, Architect
320 York Way
Sparks, NV 89431

#10205338_v10